# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

NIZAR MASOUD,
    *Plaintiff*,

v.

ANDREW SAUL, Commissioner of Social Security,
    *Defendant*.

No. 3:19-cv-00246 (JAM)

## RULING ON CROSS MOTIONS TO REVERSE
## AND AFFIRM DECISION OF THE COMMISSIONER OF SOCIAL SECURITY

Plaintiff Nizar Raef Masoud asserts that he is disabled and unable to work because of complications arising from chemotherapy for Hodgkin's lymphoma, degenerative joint disease of the left ankle, neuropathy, visual impairment, and spinal stenosis. He has brought this action pursuant to 42 U.S.C. § 1383(c)(3), seeking review of the final decision of the Commissioner of Social Security, who denied his claim for supplemental security income. Masoud has filed a motion for judgment on the pleadings, Doc. #19, and the Commissioner has filed a motion to affirm his judgment, Doc. #24.[1] For the reasons discussed below, I will grant Masoud's motion for judgment on the pleadings, deny the Commissioner's motion to affirm, reverse the decision of the Commissioner, and remand for a calculation of benefits.

### BACKGROUND

I refer to the transcripts provided by the Commissioner. *See* Doc. #14 *et seq.* Masoud is a carpenter who made a steady living in Homs, Syria, with his wife and children, until the outbreak of the Syrian civil war. "Everything was OK until the war started." Doc. #14-4 at 83-84 (Tr. 778)

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Clerk of Court shall substitute the Commissioner of Social Security Andrew M. Saul as the defendant in place of Acting Commissioner Nancy A. Berryhill who was initially named as the defendant.

1

(hearing transcript). After he was captured and tortured, Masoud fled from his captors and left Syria with his family, ending up in a Jordanian refugee camp for two years. While in the camp, Masoud discovered a lump on his neck. Cancer was suspected. Fortunately, with the assistance of Integrated Refugee and Immigrant Services, a New-Haven-based federal refugee resettlement agency, Masoud and his family were able to emigrate to the United States as refugees, at which time Masoud could be treated at the Yale-New Haven Hospital ("YNHH"). *See ibid.*

Tests conducted at YNHH in December 2015 (the onset date) rapidly revealed that Masoud had Stage IVB Hodgkin's lymphoma. *See* Doc. #14-10 (Tr. 1406). Chemotherapy was recommended as a matter of urgency, and began on January 13, 2016. *See ibid.* But the cancer and chemotherapy led to a host of adverse symptoms, including, most notably, a diagnosis of grade two neuropathy in February 2016. *See* Doc. #14-10 at 48 (Tr. 1446). By September 2017, Masoud was being treated for back pain, hearing problems, numbness in his fingers, poor vision, sleep apnea, and the loss of all his teeth. Doc. #14-10 at 144-45 (Tr. 1541-42). The chemotherapy was, however, successful: treatment was stopped in June 2016, *see* Doc. #14-9 at 332 (Tr. 1293), and by August 2016, Masoud's treating physician reported that his cancer was in remission, *see* Doc. #14-9 at 144 (Tr. 1115).

Masoud filed an application for supplemental security income on March 4, 2016, alleging a disability that began on December 1, 2015, around the time he was formally diagnosed with Hodgkin's lymphoma. *See* Doc. #14-7 at 3 *et seq.* (Tr. 886 *et seq.*). Masoud's claim was initially denied on July 29, 2016, *see* Doc. #14-5 at 8 (Tr. 806), and denied again upon reconsideration on December 5, 2016, *see id.* at 16 (Tr. 814). He then timely filed a written request for a hearing by an administrative law judge (ALJ) on January 12, 2017. *See* Doc. #14-6 at 15 (Tr. 829).

Masoud appeared with counsel and an interpreter and testified at a hearing in New Haven before the ALJ on January 16, 2018. Doc. #14-4 at 73 *et seq*. (Tr. 768 *et seq*.). Vocational expert Theresa Wolford testified by phone. *Ibid.*

On February 13, 2018, the ALJ issued a decision concluding that Masoud was not disabled within the meaning of the Social Security Act. Doc. #14-2 at 11-22 (Tr. 12-23). The Appeals Council denied Masoud's request for review on January 16, 2019. *Id.* at 2 (Tr. 1). Masoud then filed this appeal on February 20, 2019. Doc. #1.

To qualify as disabled, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966(a)-(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

The agency engages in the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or

>     combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or his past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); *see also* 20 C.F.R. § 416.920(a)(4)(i)-(v).

In applying this framework, if an ALJ finds a claimant to be disabled or not disabled at a particular step, he may make a decision without proceeding to the next step. *See* 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proving the case at Steps One through Four; the burden shifts at Step Five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

After proceeding through all five steps, the ALJ concluded that Masoud was not disabled within the meaning of the Social Security Act.

At Step One, the ALJ determined that Masoud had not engaged in substantial gainful activity since March 4, 2016, the date of his application. *See* Doc. #14-2 at 17 (Tr. 16). At Step Two, the ALJ concluded that Masoud suffered from the following severe impairments: Hodgkin's lymphoma in remission status post chemotherapy and degenerative joint disease of the left ankle. *See ibid.*

At Step Three, the ALJ determined that Masoud did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See ibid.* The ALJ then found that Masoud had a residual functional capacity ("RFC") to perform the full range of medium work as defined in 20 C.F.R. § 416.967(c). *See id.* at 20-22 (Tr. 19-21).

At Step Four, the ALJ concluded that Masoud was unable to perform any past relevant work. *Id.* at 23 (Tr. 22). At Step Five, the ALJ found that because Masoud had an RFC to perform the full range of medium work, was younger than age 49, and had limited education with no transferrable skills, a finding of "not disabled" was directed by Medical-Vocational Rule 203.26. This rule is contained in Appendix 2 to Subpart P of Part 404, *available at* https://www.ssa.gov/OP_Home/cfr20/404/404-app-p02.htm [https://perma.cc/F7EA-V5F3], and this Appendix is better known as "the grids." *See* 20 C.F.R. § 416.969 (applying the Part 404 grids to supplemental security income).

At the hearing, however, the ALJ elicited the testimony of a vocational expert. *See* Doc. #14-4 at 94-103 (Tr. 789-98). The expert testified that a person of Masoud's age, education, and work background, limited to the full range of medium work as defined in the regulations, with further non-exertional limitations of "only frequent postural activities" and "only occasional exposure to higher concentrations of dusts, fumes, gases and the like" would be able to perform a range of unskilled work. *Id.* at 95 (Tr. 790). The expert further testified that this hypothetical person who had the further limitation of "only frequent handling and fingering with both hands" but who was also "unable to communicate effectively in English, verbally or in writing" could not perform any unskilled work. Doc. #14-4 at 96-97 (Tr. 791-92).

The ALJ ultimately held that Masoud was not disabled within the meaning of the Social Security Act since March 4, 2016. *See* Doc. #14-2 at 23 (Tr. 22).

## DISCUSSION

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C.

§ 1383(c)(1) (*citing* 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

Distilled to its essentials, Masoud's briefing (Doc. #19) argues that the ALJ erred at Step Five when he relied on the grids to conclude that the Commissioner had met his burden of proving that there were jobs that exist in significant numbers in the national economy that Masoud could perform. *See* Doc. #14-2 at 23 (Tr. 22). Generally, the Commissioner can meet "the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" solely "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986). But if the grids do not "adequately reflect a claimant's condition," then an ALJ must "present either the testimony of a vocational expert or other similar evidence regarding the existence of jobs in the national economy for an individual with claimant's limitations." *Id.* at 606. "Application of the grid guidelines and the necessity for expert testimony must be determined on a case-by-case basis." *Id.* at 605.

"The Grids are inapplicable in cases where the claimant exhibits a significant non-exertional impairment (i.e., an impairment not related to strength) . . . . We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the

testimony of a vocational expert." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013).[2] A non-exertional impairment is non-negligible "when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Zabala v. Astrue*, 595 F.3d 402, 411 (2d Cir. 2010) (cleaned up).

The ALJ determined that Masoud had two medically determinable severe impairments: Hodgkin's lymphoma in remission status post-chemotherapy and degenerative joint disease of the left ankle. Doc. #14-2 at 17 (Tr. 18). Masoud does not contest the ALJ's evaluation of his remission-status Hodgkin's lymphoma or ankle disease. He does, however, contest the ALJ's conclusion that his claimed neuropathy, hearing loss, vision impairment, and spinal stenosis (with accompanying back pain) were not medically determinable, *see id.* at 17-18 (Tr. 16-17), and he also contests the ALJ's decision to reject any of these limitations when determining his RFC, *see id.* at 21-22 (Tr. 20-21). Likewise, Masoud argues there is no substantial evidence for the ALJ's determination that his emphysema and obstructive sleep apnea, while medically determinable, were "non-severe," *id.* at 19-20 (Tr. 18-19), which appears to have led the ALJ to reject the incorporation of these conditions into the RFC, *see id.* at 20-22 (Tr. 19-21).

Masoud argues that the record evidence permits the ALJ to draw only one conclusion: the RFC incorporated a mix of exertional and non-exertional limitations that rendered recourse to the grids inappropriate, and hence the ALJ's Step Five determination was in error. I agree with Masoud. The ALJ's conclusion that Masoud's neuropathy was not a medically determinable

---

[2] An exertional limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling). *See Zorilla v. Chater*, 915 F. Supp. 662, 667 n.3 (S.D.N.Y. 1996) (citing 20 C.F.R. § 404.1569a(b)); *see also* 20 C.F.R. § 416.969a (applying the same principles to supplemental security income). "A nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997) (citing 20 C.F.R. § 404.1569a(a), (c)); *see also* 20 C.F.R. § 416.969a.

7

impairment was not supported by substantial evidence. Accordingly, the ALJ should have incorporated Masoud's neuropathy in the RFC calculation as a non-exertional limitation, which in turn would render inappropriate the ALJ's reliance only on the grids at Step Five. The ALJ committed a separate harmful error when he correctly accounted for Masoud's emphysema as a non-exertional limitation when determining Masoud's RFC only to erroneously disregard this limitation at Step Five, the only means by which he could flatly apply the grids. I will consider each of these errors in turn.[3]

*Neuropathy*

The ALJ concluded that "there are no diagnostic studies or diagnoses to support a finding that neuropathy is a medically determinable impairment. Neurological examinations document [*sic*] in the record are generally normal. . . . To the extent that medical records submitted [late] may support such a diagnosis . . . such an impairment would not be severe." Doc. #14-2 at 18 (Tr. 17). I agree with Masoud that this conclusion, and the ALJ's accompanying conclusion that neuropathy does not support greater limitations than the full range of medium work, is not supported by substantial evidence.

Almost immediately after Masoud began chemotherapy, Dr. von Keudell, Masoud's treating oncologist, diagnosed him with "grade 2 neuropathy." Doc. #14-9 at 18 (Tr. 989).[4]

---

[3] Because I conclude that each of these errors would merit reversal on their own, I need not and do not consider Masoud's other claims of error.

[4] Peripheral neuropathy, or polyneuropathy, is a functional disturbance or pathological change in the peripheral nervous system that occurs in several peripheral nerves simultaneously. *See Dorland's Illustrated Medical Dictionary* ("Dorland's") 1268 (32nd Ed. 2012); *see generally Sesa v. Colvin,* 2014 WL 3858404, at *2 (S.D.N.Y. 2014), *vacated and remanded on other grounds*, 629 F. App'x 30 (2d Cir. 2015). A finding of "grade 2" neuropathy, as in Masoud's case, would place his symptoms in an intermediate level between grade 0 (none) and grade 4 (paralysis). *See* T.J. Postma & J.J. Heimans, *Grading of chemotherapy-induced peripheral neuropathy*, 11 ANNALS OF ONCOLOGY 509, 510 (2000), *available at* https://www.ncbi.nlm.nih.gov/pubmed/10907941 [https://perma.cc/8XAD-6KCE] (summarizing various scales for evaluating neuropathy). "Grade 2 neuropathy" would accord, on the World Health Organization scale, to "severe paresthesias and/or mild weakness." *Ibid.*

Masoud's neuropathy diagnosis is repeated in medical record after medical record throughout the entire period of Masoud's treatment, well after his chemotherapy concluded, and it was endorsed by the other neurologists Masoud saw in the course of his treatment.[5] To the extent that the ALJ minimized this evidence by suggesting that the neuropathy diagnosis was "new" in 2017 and after the applicable period of disability, Doc. #14-2 at 18 (Tr. 17), this ignores the earlier medical evidence and the causal connection between earlier chemotherapy and neuropathy. Given the remarkable consistency of the record on the question of Masoud's neuropathy, it was error for the ALJ to simply declare it non-determinable and exclude it entirely from Masoud's RFC.

In addition to disregarding the overwhelming evidence of neuropathy in the record, the ALJ made two plain mistakes in his discussion of Masoud's neuropathy. First, the ALJ confused diagnoses of *peripheral neuropathy* and diagnoses of *other neurological disorders*. Thus, for example, the ALJ read statements like that of Dr. Aslam, who under the heading "neuro," explained "mental status intact. Bilateral . . . extremity strength 5/5. Gross sensation intact," Doc. #14-3 at 114 (Tr. 448), as contradicting the finding of peripheral neuropathy made elsewhere. But on the very next page, Dr. Aslam indicated that Masoud still had "neuropathy." *Id.* at 115 (Tr. 449). *Accord* Doc. #14-9 at 195 (Tr. 1166) (physician assistant's statement "sensation: intact to light touch throughout" contradicted by statement, on same page, "neurological: numbness/tingling to lateral RLE"). "If the ALJ wishes to place more weight on the single

---

[5] *See, e.g.*, Doc. #14-9 at 68 (Tr. 1037) (observation of Dr. von Keudell in June 2016 that Masoud is able to button his shirts and write, but has "stable," *i.e.* persistent, "neuropathy in his right hand finger tips with constant numbness in his index and 3rd finger"); Doc. #14-9 at 195 (Tr. 1166) (observation of Dr. Laurans in Oct. 2016 that Masoud's neurological symptoms included "positive for numbness" with "numbness/tingling to lateral RLE"); Doc. #14-9 at 180 (Tr. 1151) (observation of Dr. Desan in Oct. 2016 that Masoud reported "neuropathic symptoms in his distal arms and legs"); Doc. #14-9 at 347 (Tr. 1318) (treating notes of Dr. Sack, Apr. 2017, noting "neuropathy . . . likely chemotherapy induced"); Doc. #14-2 at 140 (Tr. 139) (treating notes of Dr. Aslam, Jan. 2018, noting "neuropathy"); Doc. #14-2 at 187 (Tr. 186) (same, Feb. 2018); Doc. #14-10 at 246 (Tr. 1598) (treatment notes of treating clinical neurologist Dr. Baehrig, Aug. 2017, concluding "deep tendon stretch reflexes are diminished . . . there is mild fiber length dependent sensory loss"); Doc. #14-9 at 102 (Tr. 1073) (Jan. 2017 evaluation of Masoud by Dr. Sack, a treating physician, listing one diagnosis as "neuropathy").

statement noted above than on [the statement over the page], he will have to explain how he resolved this inconsistency in the decision." *Riechl v. Barnhart*, 2003 WL 21730126, at *11 (W.D.N.Y. 2003). The ALJ here did not.

Second, it appears that the ALJ read occasional statements in the record that Masoud's neuropathy was "normal," *see* Doc. #14-2 at 18 (Tr. 17) (ALJ decision, declaring "Neurological examinations document [*sic*] in the record are generally normal"), as meaning that Masoud's neuropathy was "not determinable," when in context these notes plainly meant only that Masoud's neuropathy was "an expected result of chemotherapy," and "not worsening or plateaued," *see, e.g.*, Doc. #14-9 at 89 (Tr. 1060) (Dr. von Keudall treatment notes of Sept. 2016, describing neuropathy as "stable"), Doc. #14-10 at 244 (Tr. 1642) (primary care treatment notes of Oct. 2017, noting neuropathy as a diagnosis despite "no residual [Hodgkin's] disease"). This sort of conceptual confusion is error. *Cf. Metzen v. United States*, 19 F.3d 795, 798 (2d Cir. 1994) (reversing as "clear error" a district court opinion confusing a low-*calorie* diet with a low-*cholesterol* diet, albeit not in the context of a social security case).

Masoud's neuropathy was medically determinable. The record is also clear that Masoud's neuropathy was non-negligible; that is, it significantly narrowed his range of work, the record noting repeatedly that it interfered with Masoud's handling, fingering, or feeling. Masoud testified that "I have numbness in my fingers. It's very difficult for me to grab things with my hands," Doc. #14-4 at 87 (Tr. 782), going on to explain that he could not manipulate things with his hands for more than ten minutes, *id.* at 89 (Tr. 783), owing to "numbness . . . and pain in my fingers," *ibid. See also* Doc. #14-8 at 23 (Tr. 920) (daily living statement compiled by Masoud indicating "my fingertips become numb from the medication"). Dr. Faisal, one of Masoud's treating physicians, noted that Masoud's "significant peripheral neuropathy . . . contributes to

poor quality of life and inability to work up." Doc. #14-2 at 192 (Tr. 191). Dr. Sack, another treating physician, concurred with this evaluation. Doc. #14-9 at 102-03 (Tr. 1073-74).[6]

Masoud and these medical sources are not, of course, vocational experts. But the vocational expert is, and she *also* testified that conditions that limited handling, fingering, or feeling would narrow Masoud's job prospects. When presented with the ALJ's hypothetical presuming a medium work base eroded by the limitation that the claimant "is limited to only frequently handling and fingering with both hands," the vocational expert testified that, when combined with Masoud's illiteracy and inability to speak English, there would be no unskilled work in the national economy Masoud could do. *See* Doc. #14-4 at 96-97 (Tr. 791-92).

The vocational expert's conclusion was consistent with the case law making clear the importance of accounting for significant neuropathy as a non-exertional impairment. *See Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 354 (E.D.N.Y. 2010) ("a claimant's limited ability to engage in 'handling, fingering, and feeling' is a non-exertional impairment," quoting S.S.R. 85-15, 1985 WL 56857 (1985)); *see also Tejada v. Apfel*, 167 F.3d 770, 775 (2d Cir. 1999) (concluding that peripheral neuropathy of the feet rendered claimant unable to perform a job involving prolonged periods of standing, and reversing ALJ's contrary determination as unsupported by substantial evidence); *Hamilton v. Colvin*, 8 F. Supp. 3d 232, 240 (N.D.N.Y. 2013) (carpal tunnel neuropathy was a non-negligible impairment).

---

[6] The ALJ accorded Dr. Sack's statement, Doc. #14-9 at 102-03 (Tr. 1073-74), "little weight [because i]t assumes diagnosis not supported by objective testing or clinical signs and appears to be heavily based upon subjective report, and also does not take into adequate consideration that the claimant's Hodgkin's lymphoma is in remission after chemotherapy," Doc. #14-2 at 22 (Tr. 21). Assuming for the sake of argument that these reasons for rejecting a treating physician opinion are even on their face the "good reasons" required by the treating physician rule, *see Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019), they are unsupported by the record. As discussed above, clinical signs of neuropathy were pervasive throughout the record; Masoud's treating neurologists appear to have been unanimous in their conclusion that Masoud suffered from at least some neuropathy for the balance of the relevant period, including after his Hodgkin's lymphoma went into remission.

I agree with the Commissioner that the ALJ was under no obligation to rely on the vocational expert's evaluation of available jobs if substantial evidence supported the conclusion that Masoud could perform the full range of work such that recourse to the grids rather than a vocational expert's testimony was appropriate. *See Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009) (approving use of grids even after vocational expert was consulted). But once it is accepted that Masoud's neuropathy is medically determinable, and that unequivocal record evidence indicated his neuropathy was non-negligible and led to a limitation to no more than frequent handling and fingering with both hands, the ALJ was not entitled to disregard the vocational expert's opinions about the impact of such a fingering and handling limitation on Masoud's job prospects. *Contrast ibid.* (approving disregard of vocational expert only because the ALJ properly relied on expert's testimony as to the vocational impact of particular limitations); *see generally Bapp v. Bowen*, 802 F.2d 601 (2d Cir. 1986).[7]

The ALJ appears to have concluded that, even if Masoud had fingering limitations, it was Masoud's lack of English proficiency and failure to train to do a new job, rather than those limitations, that were the principal obstacle to his employment. *See* Doc. #14-2 at 21 (Tr. 20). This conclusion placed the cart before the horse. In compiling Masoud's RFC, the question is the work-related impact of Masoud's medically determinable conditions (here, limitations on fingering and handling), and not whether this impact could be worked around with job retraining

---

[7] In a puzzling aside, the ALJ declared that Masoud's testimony that he had previously performed carpentry work for years in Syria and Jordan—*before the onset date* of his alleged disability corresponding with his chemotherapy treatment—was proof that he had "no functional problems with hearing or vision, or nerve limits." Doc. #14-2 at 21 (Tr. 20). But the record is plain that the inciting incident for Masoud's disability, including his vision, hearing, and nerve problems, was his cancer and the treatments used to combat it, all of which came after he had fled to America. *See* Doc. #19-2 (statement of uncontested facts). By the ALJ's Dickensian logic, a claimant whose legs were sheared off in an industrial accident would be deemed not to have any medical impairments because, pre-accident, he could walk just fine. "Medical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability." *Carway v. Colvin*, 2014 WL 1998238, at *5 (S.D.N.Y. 2014). This principle applies with particular force to evidence of a claimant's activities pre-disability as applied to determination of his post-onset residual functional capacity.

or English lessons. "Plaintiff's ability to communicate in English is a factor considered at step five, in determining what work, if any, []he is capable of performing." *Cardenas v. Berryhill*, 2017 WL 3621073, at *11 (D. Conn. 2017) (emphasis in original) (collecting regulations).

All in all, the ALJ overlooked the non-exertional limitations from Masoud's neuropathy. As a result, Masoud's RFC was not supported by substantial evidence.

*Emphysema and postural limitations*

The ALJ concluded that Masoud had been diagnosed with emphysema, and his emphysema was medically determinable. Doc. #14-2 at 17 (Tr. 16). But the ALJ went on to find that because, in February 2016, "physical examinations observed normal lung sounds" and Masoud "was still smoking at least a pack of cigarettes per day," Masoud's emphysema was "non-severe." *Ibid.* This conclusion, Masoud argues, was not supported by substantial evidence.

Ordinarily, even if Masoud was correct that the ALJ erred in determining that one or more of his ailments were not severe, the error would be immaterial: at Step Two, the ALJ concluded that Masoud had at least one severe medical impairment and proceeded to the following stages. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("Nevertheless, any error here became harmless when the ALJ reached the proper conclusion that [plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence"); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), *aff'd* 515 F. App'x 32 (2d Cir. 2013). I understand Masoud's brief to argue that the harmful error came when the ALJ excluded consideration of Masoud's emphysema in the RFC calculation.

I agree with Masoud. "Step Two may do no more than screen out *de minimis* claims." *See Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). The Second Circuit's "case law is plain that 'the combined effect of a claimant's impairments must be considered in determining disability;

the [Commissioner] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." *McIntyre*, 758 F.3d at 151-52. The exclusion of Masoud's emphysema from the RFC, then, was not supportable on the basis the ALJ gave—that it was a "non-serious" impairment. *See* Doc. #14-2 at 17 (Tr. 16). Exclusion of Masoud's emphysema from his RFC might be supportable if Masoud's emphysema was a *negligible* impairment, but the ALJ did not so find. Insofar as the ALJ made this finding tacitly, it is not supported by substantial evidence; Masoud's emphysema was non-negligible.

To begin with, although the ALJ pointed to physical examinations in February 2016 that "observed normal lung sounds," Doc. #14-2 at 17 (Tr. 16) (citing Doc. #14-10 at 34 (Tr. 1432), which does not contain any discussion of lung sounds), the ALJ never explained why Masoud's normal-sounding breath contradicts the repeated diagnoses of emphysema in the record.[8] The Second Circuit does not "require an ALJ explicitly to reconcile every conflicting shred" of medical evidence, *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981), but "affirmatively determining an issue requires some express discussion," *Sesa v. Colvin*, 629 F. App'x 30, 33 (2d Cir. 2015). Here, there was none.

The medical records themselves readily explain this apparent contradiction between the diagnosis of emphysema and Masoud's "normal lung sounds." In the treatment notes from Masoud's treating pulmonologist, she explained that while Masoud's *spirometry*, that is, the air measurement of Masoud's breathing capacity by measuring his breathing in and out, *see Wilson*

---

[8] *See, e.g.*, Doc. #14-9 at 403 (Tr. 1374) (synopsis of CT results taken in 2016 indicating "paraseptal emphysematous changes the bilateral lung apices are partially seen. There is linear subsegmental atelectasis at the lung bases bilaterally as well as the lingula"); Doc. #14-10 at 142 (Tr. 1540) (review of CT scan conducted Dec. 2016, a year after the onset date, indicating "Paraseptal emphysema is again noted in the upper lobes" of the lung); Doc. #14-9 at 347 (Tr. 1318) (Dr. Sack treatment notes, dated Apr. 2017, listing emphysema diagnosis and discussing ongoing treatment); Doc. #14-10 at 192 (Tr. 1590) (attending treating physician note dated Aug. 2017 noting emphysema diagnosis and indicating need for follow-up to "characterize the etiology of his pulmonary [symptoms]").

*v. Colvin*, 107 F. Supp. 3d 387, 391 n.8 (S.D.N.Y. 2015) (citing definition from *Dorland's*), "remain[ed] entirely in the normal range," he had a "*diffusion* impairment," that is, an impairment of the transfer of gas from air in the lung to his red blood cells, *see Johnson v. Comm'r of Soc. Sec.*, 2017 WL 4155408, at *3 (S.D.N.Y. 2017), likely caused by "radiographic emphysema and some airway wall thickening on [a] CT [scan] that could suggest chronic bronchitis component," Doc. #14-9 at 320-21 (Tr. 1291-92) (treatment notes of Dr. Possick, dated Mar. 2017). In other words, as Masoud's treating physician explained, the fact that Masoud could breathe in and out normally was not the disabling problem, and his normal-sounding breathing was not relevant to the question of whether emphysema presented a non-negligible limitation on Masoud's ability to work.

It is likewise unclear to me why the severity of Masoud's emphysema is reduced by the fact that Masoud "was still smoking at least a pack of cigarettes per day," as the ALJ appears to have concluded. Doc. #14-2 at 17 (Tr. 16). Certainly, that Masoud is a smoker "carries almost no probative value in assessing whether his reports of respiratory difficulties are credible." *Johnston v. Berryhill*, 2017 WL 2896023, at *11 (D. Conn. 2017); *see also Hilsdorf*, 724 F. Supp. 2d at 352 n.12 (E.D.N.Y. 2010) (noting that people often continue to smoke, "not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the products impacts their ability to stop" (cleaned up)). That Masoud continues to smoke, realistically, is little more than evidence of the stranglehold of his addiction to nicotine rather than a statement about the severity of his emphysema. Cigarette smoking is, at best, a vaporous basis for discrediting the treating physicians' diagnoses of emphysema.

Curiously, the ALJ appeared to agree with at least some of the above analysis. In his ruling, he explained that Masoud's RFC was limited to "medium exertion, *with postural and*

15

*environmental precautions.*" Doc. #14-2 at 22 (Tr. 21) (emphasis added); *accord id*. at 20 (Tr. 19) (describing "postural limits relat[ing] to his cancer/chemotherapy" and "medical limitations pertain[ing] to his . . . respiratory precautions"). Likewise, at the hearing, the ALJ framed his hypotheticals to the vocational expert as describing a person limited to medium work, "only frequent postural activities, [and who] should have no more than occasional exposure to higher concentrations of dusts, fumes, gases, and the like," Doc. #14-4 at 95 (Tr. 790).

Postural precautions are non-exertional limitations. *See* 20 C.F.R. § 416.969a(c)(vi) (describing non-exertional limitations as including, among other things, "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching"). So are environmental precautions. *See* Social Security Ruling 83-14, PPS-105, "Capability to Do Other Work: The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments," 1983 WL 31254 at *2. Yet despite concluding that Masoud *did* have non-exertional limitations, including as a product of emphysema, and despite tacitly concluding that these non-exertional limitations *were* nonnegligible (or else why describe them as limits when discussing Masoud's RFC?), the ALJ simply omitted these limitations from Masoud's RFC and went on to apply the grids.

Doing so was error. "Although the grid results are generally dispositive, exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *see also Iannopollo v. Barnhart*, 280 F. Supp. 2d 41, 50 (W.D.N.Y. 2003) (error for ALJ to rely on grids in disregard of record evidence of postural limitations). Particularly given that the ALJ himself appears to have concluded that Masoud could *not* perform the full range of medium work, but

16

instead was restricted from the full range of medium work by at least some postural and environmental limitations, the ALJ could not then resile from that conclusion without explanation and apply the grids in the teeth of his own findings of fact that would, if appreciated, lead inexorably to the conclusion that the grids were inapplicable. *See Chaparro v. Colvin*, 156 F. Supp. 3d 517, 538 (S.D.N.Y. 2016).

Because the ALJ's reliance on the grids meant that he failed to account for Masoud's non-exertional limitations at all, including his emphysema, the ALJ's conclusion was "fatally flawed in that it did not adequately consider whether, at the fifth step of the analysis, the Commissioner met his burden of proving that there is available work the [claimant] can perform." *Feliciano v. Apfel*, 242 F.3d 364 (2d Cir. 2000).

### *Nature of Remand*

Having concluded that the ALJ's finding of no disability was not supported by substantial evidence, I must now determine whether to remand the matter to the ALJ for reconsideration or whether to remand for a calculation of benefits. *See* 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (applying section 405(g) to supplemental security income applications). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," the matter should be remanded to the Commissioner "for further development of the evidence." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). When, however, the Court has "no apparent basis to conclude that a more complete record might support the Commissioner's decision," a remand for a calculation of benefits is appropriate. *Rosa*, 168 F.3d at 83; *Sczepanski v. Saul*, 946 F.3d 152, 161 (2d Cir. 2020) (same). In sum, when there is "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," remand for calculation of benefits is the proper course. *See Parker*, 626 F.2d at 235.

17

In cases like this where the ALJ has inappropriately relied on the grids at Step Five, the usual remedy is to remand to the Commissioner for further development of the evidence, because absent the grids, or evidence from a vocational expert, it is impossible to know whether the Commissioner has met its burden at Step Five. *See, e.g.*, *Rosa*, 168 F.3d at 82-83 (remanding for further development when ALJ inappropriately relied on the grids). This case presents a somewhat less common situation: the ALJ adduced the testimony of a vocational expert at the hearing, only to disregard it in the final analysis without explanation and instead rely on the grids. *Contrast Calabrese*, 358 F. App'x at 276 (approving use of grids despite calling the vocational expert when the ALJ specifically noted why he was rejecting the expert's testimony as to available jobs).

As I have explained, the decision to rely on the grids was error, but having already solicited the testimony of a vocational expert, it would make little sense to recall the vocational expert to give precisely the same testimony she gave at a hearing three years ago. *Cf. Butts v. Barnhart*, 388 F.3d 377, 387 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005) (remanding for further development appropriate only because ALJ "failed to develop the record as to whether [the claimant's] nonexertional limitations preclude[d] him from performing other work in the national economy").

When the vocational expert here was asked whether a hypothetical person who could do the full range of medium work limited to (1) only frequent postural activities, (2) no more than occasional exposure to higher concentrations of dusts, fumes, gasses, and the like, (3) only frequent handling and fingering with both hands, and (4) no English proficiency, the expert responded that neither the vocational expert's listed jobs, or any unskilled work, would be

feasible. *See* Doc. #14-4 at 96-97 (Tr. 791-92). In other words, under the RFC the ALJ should have reached, there were no jobs in the national economy Masoud could perform.

Given the vocational expert's testimony, combined with the limitations the ALJ himself established at the hearing—the bare minimum limitations the record supported—the Commissioner could not meet his burden at Step Five, and a finding of disability was warranted. "Remands in cases such as this one are worse than purposeless. They are expensive. Plaintiff . . . has already demonstrated entitlement to benefits. Quite apart from the administrative expenses that another remand would entail, each day of delay exacts a cost from a demonstr[ably] deserving claimant." *Maher v. Bowen*, 648 F. Supp. 1199, 1203 (S.D.N.Y. 1986); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983). Accordingly, on the basis that the record indisputably shows Masoud's disability, I will remand the case to the Commissioner solely for calculation of benefits for supplemental security income.

## CONCLUSION

For the foregoing reasons, the motion for judgment on the pleadings (Doc. #19) is GRANTED, and the motion to affirm the decision of the Commissioner (Doc. #24) is DENIED. The Clerk of the Court is directed to remand this case to the Commissioner for a calculation of benefits under 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Clerk of Court shall close this case.

Dated at New Haven this 23rd day of March 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge